Our first case is Massimo v. Apple, as are the next two. This one is 2022-16-31. Some of these issues overlap. You, of course, have to make what arguments you need to make. But to the extent that you can avoid unnecessary repetition, that would be a good thing. Mr. Larson. Good morning, Your Honor, and may it please the Court. I'd like to begin with a board error that both parties agree requires reversal, and that is the Board found obvious claims 14-18 of the 554 patent at issue in IPR 1539. I can suggest you needn't spend time on that. Thank you, Your Honor. Okay. We believe the Court should also reverse as to all the IPRs because the Board erred in its motivation to combine analysis by finding a person of skill in the art would place a convex surface over peripheral detectors even though there was no dispute that such a surface would direct light away from the periphery and toward the center. Apple's expert repeatedly admitted a convex surface would direct light towards the center of the lens, including in Apple's combinations, and yet Apple's combinations placed detectors at the periphery of the lens. And the Board never grappled with Apple's expert admissions with regard to Apple's proposed combination. In fact, here it's not just that the Board ignored certain Apple expert admissions. It's our view that the Board ignored really the entire optics theory supporting many of Apple's IPRs. Apple's theory was that a person of skill in the art would add a convex surface to increase light concentration and relied on art that placed a convex surface over a central detector. And you see in Apple's petition the theory was that this would direct light towards the center detector. And we asked Apple's expert about the prior art that Apple was relying on, in particular Inokawa. Inokawa places a convex surface over a central detector with a dotted line down the middle with arrows pointing towards the center. And we asked Apple's expert about that reference. And he testified that, yes, the goal in Inokawa is to direct light towards the center detector. And then we asked him, what would be the impact if you were to move the detectors and the LEDs? And he testified that it wouldn't be so clear that Inokawa would provide you that benefit. It isn't so obvious, he testified. Can I ask you a housekeeping question? Yes. Do you agree that the greatest curvature theory and the most pronounced curvature theory are interchangeable? I've seen a couple of different theories in the briefing here. Well, it's not really clear from the board's decisions whether that's the case. And that's one of the issues here. As we go through these three appeals, you're going to see the board adopt three different theories regarding the optics. In the first appeal, we're going to be discussing the greatest curvature theory that Apple advocated, among many other theories that the board selected in the first appeal. The second appeal, we're going to be looking at a theory that light would increase everywhere. Somehow a lens would concentrate light everywhere. You get to the third appeal, and you see the board talk about most pronounced curvature. And it's not clear from the board's decision what its rationale was. I know that Apple stopped advocating the greatest curvature theory in the later IPRs, and so it may be that the board was still relying on that theory as the one that the board selected, even though it wasn't really being advocated anymore. In fact, Apple's primary theory was a reversibility theory, the fact that you could swap the detectors and the LEDs, and that would have the same impact. But the board didn't adopt that theory. So the analysis looks to be very similar, but it's not clear from our perspective. Now, after Apple recognized the weakness in its position, it changed its position and advocated many theories. And the issue that we have is that the board never reconciled the theory that it chose, the greatest curvature theory, with many issues in the record, because that wasn't Apple's theory in its petition. For example, there's no analysis balancing the undisputed flow of light to the center from a convex lens that you have from Apple's initial petition, Apple's expert admissions. In fact, in the third appeal, you'll see Apple's appeal brief even acknowledges that a convex lens would direct light towards the center. So you have the board adopting this greatest curvature theory without providing an analysis of if there were some benefit from the greatest curvature theory. Is that a greater... If the board did not credit Dr. Kinney's testimony on the greatest curvature theory, would the board's analysis on the motivation to improve light collection have been adequate in your opinion? No, because if you remove Dr. Kinney's theory attempting to provide some support for directing light towards the periphery, now you're left with just Apple's admissions in its petition and its expert declaration, and Apple's experts' many admissions during his deposition that a convex surface would direct light towards the center. So in our view, a person of skill in the art, having that knowledge of a convex surface, which you see in an Acala, would not have been motivated to add a convex surface over peripheral detectors, in particular to increase light concentration, which was the asserted motivation in six of the IPRs at issue today. In the ten others, the board primarily relied on a motivation to increase adhesion and provide protection, and didn't rely on a motivation to increase light concentration. But our view, we still argued that a person of skill in the art would take into account the optics, and that would be a reason for the person of skill in the art not to add the convex lens. And so, I mean, these admissions are extensive. Apple's expert testified, yes, a convex lens would condense light towards the center, and that's because light's being directed from the periphery towards the center. And so we have these extensive admissions. We don't have a balancing of Apple's greatest curvature theory with those admissions. We also don't have an explanation of how the board's greatest curvature theory can be reconciled with the many different illustrations of the lens in Apple's combination. And you'll see that throughout these three different appeals. The lens shapes all over the map. And the reason for that is because Apple's petition didn't rely on a particular curvature at any particular location. Apple's petition relied on this erroneous theory. Well, it's true that a convex surface would direct light towards the center, but Apple's combination placed the detectors on the periphery. If we agree with Apple that the greatest curvature theory is an expansion on the motivation to improve light collection already discussed, what is your best legal support for your argument that the board erred in relying on the greatest curvature theory? I think that the board itself needs to provide an explanation for its reasoning. I think you see that from the case law. We cited several cases where the board erred when it failed to address an admission. We see where the board erred when it failed to address key disclosures of the prior art. We know from cases like applications and Internet time, the board is not allowed to selectively weigh the record. The board is not allowed to provide a shortcut. It's consideration of the factual record. And, in fact, in cases like Keymore's, the board actually discussed evidence, and the federal court said the board didn't consider it. In other words, as the court explained, it didn't adequately consider it or didn't grapple with it enough given the importance of the evidence. Counsel, we understand due process, but these are complex cases. There's a lot of close prior art. The board wrote a lot on all of these. And what you're saying is, well, they didn't quite connect everything together. Don't we owe them some deference to the extent of respecting that they did a thorough job with a lot of issues and a lot of claims and a lot of patents in close prior art? Well, I think deference to the board is based on a presumption that the board didn't commit fundamental errors when it was analyzing the evidence. And although there's a lot of paper in this case, there's a lot of board decisions and a lot of discussion, our appeal really focuses on two primary buckets of evidence that we believe the board failed to adequately consider that undermines all the motivations. The first is Apple's admissions extensively that a convex surface would direct light towards the center. And we believe that directly undermines the board's motivation to combine to increase light concentration in six of the IPRs. And we looked at this carefully, and at best you maybe see a reference to it in the background. We don't see the board reconciling its decision or squarely addressing certainly the full scope of these admissions in its analysis of the party's positions. The other bucket, we'll talk about it in a little bit, is a really key critical disclosure in the Osaki reference that the board relied on heavily throughout all these IPRs. And there, the assertive motivation was a motivation to increase adhesion. And the board started with Aizawa, as you know, a sensor that would be placed on the wrist side that teaches that its flat surface provides adhesion. And the board reasoned that a person of steel in the art would take the protrusion from Osaki and change Aizawa's flat surface to a protrusion to increase adhesion. But the board failed to address the most critical disclosure, in our view, in Osaki that says that Osaki's protrusion has a tendency to slip at Aizawa's measuring location. And so what you're left with from this record is a number of... So is that a teaching away argument? It could rise the level of teaching away. Do you think legally that rises to the way of teaching away? I think it rises to the level of a teaching away. What if we conclude that it doesn't? Then even if it doesn't rise to the level of a teaching away, I think this court's precedent makes clear that it can still undermine a motivation to combine. It doesn't have to rise the level of teaching away if it directly undermines the motivation to combine. And, you know, if the board had addressed it and explained it, explained its reasoning and why it was rejecting that portion of Osaki, that might be one thing. But we have this critical disclosure in Osaki that says its protrusions would have a tendency to slip off at Aizawa's measuring location, and we don't see the board addressing that. And so that error in that bucket, that fundamental error, I think is, from our perspective, pretty straightforward, undermines the board's motivation to combine in the other 10 IPRs we're going to see in the three appeals today. Now, the only other motivation the board relied on was the motivation to provide protection. And you see that whenever the board relied on the motivation to increase adhesion with Osaki, then the board would also rely on a motivation to provide protection. But there was no dispute that a flat cover provided the same protection as a protrusion. And so in our view, for example, the Winter International Royalty case, where the evidence was that the change wouldn't provide any benefit, our view is, you know, there's really no substantial evidence support to say that a person of skill in the art would be motivated to change Aizawa's flat plate, which Aizawa describes as providing an increase in adhesion, to a protrusion that provides the same amount of protection and that it's undisputed also provides disadvantage. So is it your view that our case law is that you have to show that the combination of the motivation has to show that there would have been a benefit or substantial benefit, or just that there's an alternative way of doing it? Maybe it's a little better, maybe it's a little worse. It could be cost savings, et cetera, right? Am I correctly describing our case law that if you do not have to show it would have been better? In some cases, I would agree, the case law shows it doesn't have to be better. I think those cases involve where there's a finite number of predictable solutions and one could easily choose between them. And in this case, Apple's expert testified there's a universe of potential lens shapes that a person of skill in the art might consider and might choose. And so when you have, especially with Aizawa, which has these peripheral detectors and they're designed to be measuring different locations at the wrist, with these narrow cavities that are all designed to take measurements right at those locations, the idea that a person of skill in the art would take its surface that already provides protection, be motivated to change it to a protrusion, which completely changes the optics of Aizawa, it's undisputed it would create scratches. We don't think that motivation would be there. When it's undisputed, it would provide no more benefit. Counsel, your time is well into rebuttals, so perhaps we should listen to the other side and we'll give you three minutes of rebuttal time. Thank you. May it please the Court, Lauren Degnan for Apple. Of the many issues Massimo raises on appeal, almost all of them turn on the substantial evidence standard, and we would submit applying that standard this Court should affirm. I'm going to start with the adhesion issue, where Counsel sort of made it up. I'm sorry, could you start from where he started, which is at the center in Apple's expert testimony? Absolutely. So you want me to discuss the convexity? Yeah. Okay, sure. Sorry to throw you off your... No, no, no. I'm happy to talk about anything you want to, Judge Proust. I think where we can start with this is that the motivation to combine in the petition discussed using a convex lens based on Inokawa's teachings, that that would improve the light-gathering ability of the center. Now, that motivation combined does not focus on any sort of theory that all light must go to the dead center in a convex lens. That's not there. Rather... Your expert said towards the center, right? He said towards the center, Your Honor. And in connection with dependent claims, claim 12, which has the mean path length, he gives an example showing how a particular exemplary beam of light would be directed more towards the center. And that is true. But what he also explained is that the generalized teaching of Inokawa does two things. One, that a person with a skill in the art would understand that you could tailor the convexity of the lens so that it could direct light where it was towards the detector, depending where the detectors are. And also, in general, a lens, given the nature of the light being backscattered and diffuse, would also increase the light-gathering ability. And I'd ask you to take a look at the figure that he provides at paragraph 42 of his second declaration, in appendix 4553. And there, that figure, he shows the green arrows where the light is backscattered. He's got red arrows showing how the light is moved towards the center. And what you see is that the light being backscattered all over the place does go towards the direction of the detectors. Now, the detectors are not at the very edge. They are not in the dead center, but they are between the dead center and the edge. So in that figure, we see that the light can be directed inward and still be in the direction of the sensors. In light of time, can I follow up on the question that Judge Cunningham asked earlier of your friend on the other side, which is this greatest curvature theory seems to result in a lot of spilled ink. Let's assume we have some trepidation or some concern about the board's invocation of what we now call the greatest curvature theory. Is there enough, the board said, other than that to provide a basis for a firm, or is that a problem? It is not a problem, Your Honor. And I think what I would direct you to is the discussion, starting at the board's discussion, say, appendix 51 through 54. The board starts the discussion by explaining that the nature of this light being backscattered, which was supported with respect to the optics book it cited, and even it cites an agreement by Massimo's expert. The nature of the light itself would have suggested that a lens might be useful to increase the amount of collected light. The board then follows that up by citing to Inokawa itself, which, as we know, teaches that using a lens will increase the light gathering. So that is the fundamental teaching. And from that, the claims do not require specific curvatures. And really, the board relies on and talks about this theory of greatest curvature or most pronounced curvature in order to rebut, to reject an argument by Massimo that the combination would not work, would not be able to direct the light to the appropriate sensors. Do you think those two theories are interchangeable, basically the same question I asked the closing counsel? I think they are, Your Honor. I think the board used different language. And substantively, when you read them, when you read the board's decisions, I don't see a lot of daylight between them. If we are okay with the light collection, I can talk about adhesion. All right, so on adhesion... Let me just address at the outset this statement in Osaka at paragraph 23, discussing the figure three, showing that there is a tendency to slip. At most, this statement could discourage using Osaka's exact sensor, which, by the way, was made of glass, on the front of the wrist while the wrist was in motion. At most, it could be somewhat of a discouragement of that. The claims here are not limited to the front of the wrist. They're not limited to in motion. And substantial evidence supports the board's finding that Osaka as a whole teaches adhesion benefits of a convex protrusion. That's, of course, in paragraph 25, discussing figure four. And figure four is the only part of Osaka that teaches and that compares curved, convex versus flat. Figure three doesn't do that. And I'll remind you, one of the skill in the art, we'll look at the combination. And Aizawa's cover is made of acrylic. It's an acrylic plate-like member. And the acrylic is going to have different properties. It was taught by Aizawa to be instrumental in improving adhesion. And so there's nothing in Osaka that is certainly no teaching away. But again, if you remember, we're looking through the lens of one of the skill in the art who knows both teachings, eminently supported by the board and substantial evidence that one of the skill in the art would have naturally been motivated to get the benefit of the convex protrusion and the acrylic material. Do you agree that Apple's expert conceded that the adhesion improvement can be achieved without an acrylic material? I think what the expert stated was that the acrylic material is one kind of material that could be used. And so I think that's as far as he went, frankly. But nevertheless, we're really talking about neither reference having a teaching away from this combination. And so even if he acknowledges other materials would be fine, I think the board was allowed to rely on the express language of the references themselves to conclude that a person's skill in the art would have been motivated to combine them. Do you agree that the sense of protection issue rises and falls with the adhesion motivation issue? I think it depends a little bit on the combination because in the Mendelssohn 799 combination, so Mendelssohn and Osaki, that's in the 1536, the 1538, and the 1714. Mendelssohn's 799 has no cover at all. And so I think for that, again, there's multiple reasons to make this combination in Mendelssohn with Osaki, only one of which is protrusion. But certainly for Mendelssohn's 799, which has no cover, protecting the elements would be an independent and fully supported reason to combine. In terms of the, I guess, with those Aizawa, which has a cover, I don't think it stands or falls. With adhesion, I would say there the response is a bit different. One of skill in the art, in order to prove motivation to combine, as Judge Post indicated, your case law does not say we have to show it's better in a categorical sense. I think the Intel PACT case that came out earlier this year, I'm sure you all are familiar with it, but it's at 61 Fedforth at 13881, says so expressly that it doesn't have to be a categorical improvement or an improvement in a categorical sense, just a suitable option. And frankly, it was building upon the principles that were in the Amaral case we cited in our briefs. And so when we've got two suitable options, which no question, flat and curved or convex are suitable options, there was no burden upon Apple as petitioner to prove one is categorically better than the other for there to be a motivation to combine. But again, that is the third motivation to combine with respect to the combination of Aizawa and Osaki. So maybe the question I should ask is, do you think we need to reach that issue with respect to the sensor protection? You do not, Your Honors. Any one of them would be sufficient. And just for some housekeeping, the adhesion one covers every asserted claim in the 1631 case and many of the claims in the other appeals. So if the Court has no other questions, I will get back to balance my time. Thank you, Ms. Douglas. No one ever loses points for not using up all their time. Mr. Lawson. Thank you, Your Honor. Given that we have three appeals today, I'll just make a couple quick points. One is Apple pointed to its experts' declaration showing the Riveros on Inokawa. This was Apple's experts' reply declaration to which we never had an opportunity to respond. And again, this is contrary to Apple's experts' testimony of how a person of skill in the art would interpret Inokawa. This was Apple's attempt to reinterpret, reimagine its positions to put some light concentration towards the exterior. The only other point I'll briefly make is counsel mentioned that, argued that Aizawa's acrylic material is what provided the adhesion. And again, Apple's expert admitted that it was Aizawa's cover that reduces slippage. And you can see this, for example, at APPX 05428, 134.9-14. It says Aizawa's plate is described as a plate-like member. It doesn't explicitly require the use of acrylic. At APPX 06946, 257.12, Apple's expert testified that Aizawa describes the use of a cover to reduce slippage. And we think Aizawa itself also makes that clear. The issue, again, is we never had a chance to address this because this was a determination the board made on its own for the first time in its decision that it was Aizawa's acrylic material as opposed to flat plate that would provide adhesion. Unless you guys have more questions, I'll... Thank you, counsel. Stop there. Thank you.